UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLSTATE VEHICLE AND
PROPERTY INSURANCE COMPANY,　　Case No. 19-cv-11833

　　　　　　　Plaintiff,　　　　　Paul D. Borman
v.　　　　　　　　　　　　　　　United States District Judge

VALENTINA TODARO,　　　　　　Anthony P. Patti
　　　　　　　　　　　　　　　United States Magistrate Judge
　　　　　　　Defendant.
_____/

## OPINION & ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 21)

### I.　INTRODUCTION

In this declaratory judgment action, Plaintiff Allstate Vehicle and Property

Insurance Company (Allstate) seeks an order of summary judgment "declaring that

Allstate does not have to continue defending, and that it does not have a duty to

indemnify Amber, Michael, or Michelle Montoya against the allegations brought

against them by Valentina Todaro." (ECF No. 21, MSJ, PgID 293.) Defendant

Valentina Todaro, the plaintiff in the underlying lawsuit, opposes Allstate's

Motion. (ECF No. 23, Response.)

At issue is whether Allstate, which provided home insurance to the

Montoyas during the relevant time period, is required to defend the Montoyas

against Todaro's assault, battery, and vicarious parental liability claims in the

underlying lawsuit in Lapeer County Circuit Court. Allstate argues that Amber

Montoya's alleged actions—pushing Todaro into a bus seat, holding her down, and punching her multiple times in the face and head—were intentional and not accidental, so they are not covered by the insurance policy. (ECF No. 21, MSJ, PgID 281–93.) Todaro argues that the policy language is ambiguous and contrary to public policy and therefore it should be read in favor of coverage. (ECF No. 23, Response, PgID 396–402.) Todaro's position is contrary to Michigan law and requires an unduly strained reading of the contract language. Therefore, the Court grants Allstate's Motion for Summary Judgment and declares that Allstate has no duty to defend or indemnify the Montoyas in the underlying action.

## II.     FACTS

The facts are undisputed. Allstate issued a "House & Home Policy" to Michael and Michelle M. Montoya, covering them from July 17, 2016 until July 17, 2017. The policy contained the following relevant provisions:

**Definitions Used in This Policy**
Throughout this policy, when the following words appear in bold type, they are defined as follows:
1.      **Bodily Injury**—means physical harm to the body . . .

5.      **Insured person(s)**—means **you** and, if a resident of **your** household:
(a)      any relative; and
(b)      any person under the age of 21 in **your** care . . .

7.      **Occurrence**—means an accident, including continuous or repeated exposure to substantially the same general harmful conditions during the policy period, resulting in **bodily injury** . . .

12.  **We**, **us**, or **our**—means the company named on the Policy Declarations [Allstate]. . . .

14.  **You** or **your**—means the person listed under Named Insured(s) on the Policy Declarations as the insured [Michael and Michelle M Montoya] and that person's resident spouse. . . .

**Family Liability Protection–Coverage X**

**Losses We Cover Under Coverage X:**
Subject to the terms, conditions and limitations of this policy, **we** will pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies, and is covered by this part of the policy. . . .

**Losses We Do Not Cover Under Coverage X:**
1.  **We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any **insured person**. . . .

**Guest Medical Protection—Coverage Y**

**Losses We Cover Under Coverage Y:**
**We** will pay the reasonable expenses incurred for necessary medical, surgical, X-ray and dental services, ambulance . . . and pharmaceuticals. These expenses must be incurred and the services performed within three years from the date of an **occurrence** causing **bodily injury** to which this policy applies, and is covered by this part of the policy.

Each person who sustains **bodily injury** is entitled to this protection when that person is: . . .

2.  off the **insured premises**, if the **bodily injury**: . . .

   b)  is caused by the activities of an **insured person** . . .

> **Losses We Do Not Cover Under Coverage Y:**
> 1.     **We** do not cover any **bodily injury** or **property damage**
> intended by, or which may reasonably be expected to result from the
> intentional or criminal acts or omissions of, any **insured person**. . . .

(ECF No. 21-3, Policy, PgID 341–42, 360, 325, 362.) The policy also contains a
choice-of-law provision that says, "the laws of the state in which the **residence
premises** is located shall govern any and all claims or disputes in any way related
to this policy." (*Id.* at PgID 343.)

On April 29, 2019, Defendant Valentina Todaro filed a Complaint against
Amber Montoya, Michael and Michelle Montoya's daughter, for assault and
battery in Lapeer County Circuit Court. (ECF No. 21-2, Underlying Complaint,
PgID 306–07.) Todaro's claims arose out of an alleged incident on May 2, 2017.
(*Id.* at PgID 303–07.) According to the Complaint, Todaro was on a school bus
heading to the Ed Tech building from Almont High School, attempting to move
into a seat when, without provocation, Amber Montoya yelled "something to the
effect of, 'move out of my fucking way, bitch.'" (*Id.* at PgID 303.) Todaro
continued to try to move into her seat, but Amber pushed her "down into the seat,"
held her down, and "proceeded to punch [Todaro] in the right side of her face." (*Id.*
at PgID 304.) As a result, Todaro "experienced bruises on her head, headaches,
blurred vision and damage to her jaw" which required significant medical
treatment, including wearing a mouth brace "to prevent her jaw from clicking

painfully and locking up." (*Id.* at PgID 306.) Todaro further alleged that Amber had previously yelled at her and threatened violence against her, and that Amber continued to subject her to verbal abuse and threats throughout the rest of the 2016-2017 school year as well as the 2017-2018 school year. (*Id.* at PgID 304–05.)

Todaro also alleged that Michael and Michelle Montoya are vicariously liable for Amber's assault and battery under Michigan's parental liability statute, Mich. Comp. L. 600.2913. (*Id.*) The Michigan parental liability statute says:

> A municipal corporation, county, township, village, school district, department of the state, person, partnership, corporation, association, or an incorporated or unincorporated religious organization may recover damages in an amount not to exceed $2,500.00 in a civil action in a court of competent jurisdiction against the parents or parent of an unemancipated minor, living with his or her parents or parent, who has maliciously or wilfully destroyed real, personal, or mixed property which belongs to the municipal corporation, county, township, village, school district, department of the state, person, partnership, corporation, association, or religious organization incorporated or unincorporated or who has maliciously or wilfully caused bodily harm or injury to a person.

Mich. Comp. L. 600.2913.

The Montoyas asked Allstate to defend and indemnify them against Todaro's claims under the House & Home Policy. Allstate agreed to provide a defense, subject to a reservation of the right to deny the obligation to defend and indemnify in the future. (ECF No. 1-3, Reservation of Rights Letter, PgID 86–90.) In its reservation of rights letter, Allstate specifically identified the provisions of

the House & Home Policy now at issue. (*Id.* at PgID 87–89.) Allstate initiated the current action on June 20, 2019, naming the Montoyas and Todaro as defendants. (ECF No. 1, Complaint.) Allstate asks the Court to find that it has no duty to defend or indemnify the Montoyas against Todaro's claims. (ECF No. 21, MSJ.)

The Montoyas, whose 2016-2017 House & Home Policy is the subject of the controversy, are no longer parties—they agreed to be bound by the findings of this Court and were dismissed by stipulated order on August 8, 2019. (ECF No. 10, Consent Order, PgID 119–20.) Todaro is the sole remaining defendant.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In making the determination whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). At the same time, the non-moving party must produce enough evidence to allow a reasonable jury to find in its favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. "The 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). A court "may not make credibility determinations or weigh the evidence" in summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.   ANALYSIS

At issue is whether Allstate owes the Montoyas the duties to defend and indemnify against Todaro's allegations under the House & Home Policy. The parties agree that Michigan law governs this dispute. (ECF No. 21, MSJ, PgID 278–79; *see* ECF No. 23, Response, PgID 396–407 (applying Michigan law).)

The duties to defend and indemnify are related because they arise "only with respect to insurance afforded by the policy." *American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450 (1996). In other words, "[i]f the policy

does not apply, there is no duty to defend." *Id.* The respective scopes of the duties, however, are not identical. *Id.* "[T]he duty to defend is broader than the duty to indemnify. If the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense." *Id.* at 450–51 (citing *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich. App. 136, 141–42 (1981); *Polkow v. Citizens Ins. Co.*, 438 Mich. 174, 178, 180 (1991); and *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 662 (1989)). The duty to indemnify, in contrast, arises only when the third-party's allegations have been proven or when, after factual development, the parties decide to settle the claims rather than test their veracity in court. *See, e.g.*, *Citizens Ins. Co. v. Secura Ins.*, 279 Mich. App. 69 (2008) (finding that insurer owed duty to defend but that duty to indemnify turned on fact-finder's resolution of critical coverage issue).

Coverage, or the possibility of coverage, is determined by "the policy language as applied to the specific facts in a given case." *Gelman Sci., Inc. v. Fidelity and Cas. Co.*, 456 Mich. 305, 316 (1998). Insurers must look at the allegations in the third party's complaint to determine whether coverage is possible, and they must also look behind those allegations because the duty to defend is not "limited by the precise language of the pleadings." *Detroit Edison Co.*, 102 Mich. App. at 142. If there is reasonable doubt as to whether the pleadings establish the possibility of coverage, "the doubt must be resolved in the

8

insured's favor." *Id.* For example, in *Detroit Edison*, the court held that coverage was possible under a policy that covered supervisory negligence but not ordinary employee or co-worker negligence when the allegations in the complaint implied that there had been a failure to supervise, even though the complaint itself did not contain a claim for negligent supervision. *Id.* at 139–42.

Courts applying Michigan law interpret insurance policies according to well-established principles of contract construction. *Allstate Ins. Co. v. McCarn*, 466 Mich. 277, 280 (2002). Accordingly, the policy "must be enforced according to its terms." *Id.* If a term is clearly defined in the policy, courts must accord that term its stated meaning. *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 567 (1999). If a term is not defined, courts must accord that term its commonly used meaning. *McCarn*, 466 Mich. at 280. It is improper for courts to "rephrase or interpret the clear and unambiguous language of the policy," instead of simply enforcing the policy as written. *Group Ins. Co. of Mich. v. Czopek*, 440 Mich. 590, 596 (1992). This is so because "an insurance company cannot be found liable for a risk it did not assume." *Id.* at 597. Thus, courts must enforce the terms of an insurance policy so long as they are unambiguous and are not in contravention of public policy. *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 161 (1995).

That said, Michigan law also recognizes that the terms of insurance contracts are drafted by the insurance industry so "[p]olicyholders have little or no

bargaining power to change terms." *American Bumper*, 452 Mich. at 448. Therefore, "any ambiguities are strictly construed against the insurer to maximize coverage." *Id.* This protects the policyholder from confusing and overly technical language. *Gelman*, 456 Mich. at 318.

"An insurance contract is ambiguous when its provisions are capable of conflicting interpretations." *Nikkel*, 460 Mich. at 566. Whether an insurance contract's provisions lead to conflicting interpretations must be determined by reading the contract as a whole. *Farmers Ins. Exch. v. Kurzmann*, 257 Mich. App. 412, 418 (2003) ("An insurance policy must be read as a whole in order to discern and effectuate the intent of the parties.") Where reading the contract as a whole fairly leads to only one reasonable interpretation, a court may not read the provisions in isolation to create an ambiguity where none existed. *See Heniser*, 449 Mich. at 161 ("Terms in an insurance policy must be given their plain meaning and the court cannot 'create an ambiguity where none exists.'") (citing *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 206 (1991)). Similarly, locating a clause that limits coverage in the definition section does not render the clause ambiguous as long as the policy as a whole has only one fair interpretation. *See Nikkel* 460 Mich. at 568–69 (rejecting argument that placing the definition of "non-owned automobile" into a separate definitions section rendered the policy ambiguous).

If the policy contains ambiguous provisions, courts apply the rule of reasonable expectations. *See Gelman*, 456 Mich. at 318. Under the rule, the court examines the contract language to determine whether a policyholder "is led to a reasonable expectation of coverage." *Id.* A policyholder's expectation of coverage is unreasonable if, upon sufficient examination of the policy, the policyholder would have discovered a relevant, unambiguous clause eliminating coverage. *See Nikkel* 460 Mich. at 569 ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists in the nonowned automobile clause and the insured could have discovered the clause on examination of the contract.").

These rules of interpretation are applied to insurance contracts in two steps. *See Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 382 (1997). First, the court determines whether coverage exists "according to the general insurance agreement." *Id.* Second, the court determines whether an exclusion in the contract applies to negate coverage. *Id.* The insured bears the burden of proving coverage at step one, and the insurer bears the burden of proving that an exclusion is applicable at step two. *Heniser*, 449 Mich. at 505 n. 6.

## A. Coverage

Here, Allstate argues that coverage does not exist under the Montoyas' House & Home Policy because Amber Montoya's alleged actions were not an "occurrence" as defined in the policy. (ECF No. 21, MSJ, PgID 281–85.) Allstate

11

also argues, in the alternative, that even if coverage exists, the intentional or criminal acts exclusion is applicable and negates coverage. (*Id.* at PgID 285–88.) Application of Michigan's well-established rules of insurance policy interpretation reveals that Allstate is correct—Amber Montoya's alleged actions do not constitute an "occurrence" subject to coverage under the House & Home Policy.

Like many other insurance policies that Michigan courts have found unambiguous and in accord with public policy, Allstate limits family liability coverage and guest medical coverage to bodily injuries arising from an "occurrence." (ECF No. 21-3, Policy, PgID 360, 362); *E.g. Nabozny v. Burkhardt*, 461 Mich. 471, 473 (2000) (noting that policy limited liability coverage to bodily injury arising from an "occurrence"); *Czopek*, 440 Mich. at 597 (same). Specifically, Allstate, in the policy, agrees to "pay damages which an **insured person** becomes legally obligated to pay because of **bodily injury** or **property damage** arising from an **occurrence** to which this policy applies," as well as reasonable medical expenses incurred "within three years from the date of an **occurrence** causing **bodily injury** to which this policy applies." (ECF No. 21-3, Policy, PgID 360, 362.) The only fair reading of this language is that coverage is limited to injuries from an occurrence. *Nabozny*, 461 Mich. at 473.

An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful

conditions during the policy period, resulting in **bodily injury** or **property damage**." (ECF No. 21-3, Policy, PgID 341–42.) Because "occurrence" is clearly defined in the Montoyas' policy, the Court must apply the stated meaning of the term. *Nikkel*, 460 Mich. at 567. Therefore, in order for coverage of Todaro's bodily injuries to be possible, they must have been caused by an "accident."

The policy does not define "accident," so the Court must apply the common meaning of "accident." *McCarn*, 466 Mich. at 280. Michigan courts have consistently found that the common meaning of "accident" is:

> [A]nything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected.

*Metro. Prop. & Liab. Ins. Co. v. DiCicco*, 432 Mich. 656, 669 (1989); *McCarn*, 466 Mich. at 281 (collecting cases). Whether or not an event is an accident is determined from the perspective of the insured, not the injured party. *Nabozny*, 461 Mich. at 477. Put differently, the focus is on the injury-causing act or event and "its relation to the resulting property damage or personal injury," not on the expectations of the injured party. *Id.* "[I]f both the act and the consequences were intended by the insured, the act does not constitute an accident." *McCarn*, 466

Mich. at 282. Similarly, if the act was intended and it created "a direct risk of harm from which the consequences should reasonably have been expected by the insured" it is not an accident. *Id.* at 283.

Based on the common meaning of "accident," Michigan courts have found that injuries caused by intentional violence, such as punching, kicking, or tripping, are not accidents, whether or not the insured intended to cause the specific injury that resulted. *See Nabozny*, 461 Mich. at 479–82. In *Nabozny*, the insured, Burkhardt, and Nabozny were in a physical fight when Burkhardt hooked his leg around Nabozny's legs and shoved him. *Id.* at 473. This action broke Nabozny's ankle. *Id.* Even though Burkhardt denied any intent to break Nabozny's ankle, the court found that Nabozny's injury was not an accident because Burkhardt's actions created a direct risk of injury and a broken ankle reasonably should have been the expected result. *Id.* at 481–82. Similarly, in *Czopek*, injuries caused by an insured violently resisting arrest in freezing weather by kicking and biting police officers for over an hour were not accidental even though the insured intended only to resist arrest, not to cause broken ribs and frostbite. 440 Mich. at 594, 598. By contrast, a Michigan court found a genuine dispute as to whether a stabbing was an accident when the injured party grabbed the person holding the knife and pushed him into a wall, at which point the knife entered the injured party's body. *DiCicco*, 432 Mich. at 664. The facts were not sufficiently clear for the court to determine

that the insured, the person holding the knife, intended to stab the injured party in the first place, making the resulting stabbing an accident. *Id.* at 672.

Amber Montoya's alleged actions do not constitute an accident and are therefore not an occurrence subject to coverage under the House & Home Policy. Todaro's complaint alleges that Amber's actions amounted to assault and battery— torts that require proof of intentional actions. (ECF No. 21-2, Underlying Complaint, PgID 306–07); *see Tinkler v. Richter*, 295 Mich. 396, 401 (1940) (defining assault as "any intentional offer of corporal injury to another by force" and battery as "the willful touching of the person of another"). Intentional actions are not accidents, unless the consequences were unforeseeable. *See McCarn*, 466 Mich. at 290 (finding that intentional act of pulling trigger of gun led to an accident because the person who pulled the trigger believed the gun to be unloaded, making the resulting harm unforeseeable). Here, the consequences of Amber's alleged intentional acts, holding Todaro down and repeatedly punching her in the face, were foreseeable because the acts created a direct risk of the harm that Todaro experienced—bruises, headaches, blurred vision, and damage to her jaw. (ECF No. 21-2, Underlying Complaint, PgID 306.) Amber's alleged acts are similar to the tripping in *Nabozny* and the kicking and biting in *Czopek* because all are acts of violence that create a reasonably foreseeable direct risk of injury. *Nabozny*, 461 Mich. at 479–82; *Czopek*, 440 Mich. at 594, 598.

15

Even beyond the specific allegations and precise language of the Complaint, there is no evidence to suggest that Todaro's injuries resulted from an accident. *See Detroit Edison Co.*, 102 Mich. App. at 142 (noting duty of insurers to look beyond the specific allegations in the complaint). Todaro has not offered any evidence that Amber Montoya's actions were accidental, or that she did not intend to cause the injuries Todaro suffered. In fact, Todaro, in her Answer, admitted Allstate's allegations that "[n]one of Amber Montoya's alleged conduct was accidental," and that "Amber Montoya's alleged conduct was intentional in nature." (ECF No. 8, Answer, PgID 106, ¶¶ 23–24.) Thus, it is undisputed that Todaro's bodily injuries were not caused by an accident. Therefore Todaro's assault and battery claim against Amber Montoya, as well as her derivative parental liability claim against Michael and Michelle Montoya, do not arise from an occurrence, as defined by the policy. These claims are not covered by the policy and Allstate does not owe the Montoyas the duty to defend or the duty to indemnify.

Defendant Todaro attempts to avoid this inevitable conclusion by ignoring the policy definition of "occurrence" and arguing that the use of the term "occurrence" instead of the word "accident" creates ambiguity in the policy. (ECF No. 23, Response, PgID 397–400.) She then attempts to use the rule of reasonable expectations to argue that the House & Home Policy could be reasonably read to cover injury "arising from an event or incident that was caused by a person insured

16

under the policy." (*Id.* at PgID 399.) This argument is contrary to well-established Michigan law. When a term, like "occurrence," is clearly defined in the policy, that definition of the term controls. *Nikkel*, 460 Mich. at 567. When a term is not defined, like "accident," the commonly used meaning controls. *McCarn*, 466 Mich. at 280. Michigan courts regularly apply these rules to find policies where the term "occurrence" defines the scope of coverage and where "occurrence" is, in turn, defined as an "accident" unambiguous. *See McCarn*, 466 Mich. at 281 (collecting cases). Todaro does not attempt to distinguish these cases. Thus, the House & Home Policy is not ambiguous and there is no reason to resort to the rule of reasonable expectations. *See Nikkel* 460 Mich. at 569 ("[T]he rule of reasonable expectations has no applicability here because no ambiguity exists."). The House & Home Policy precludes coverage.

### B.    Defendant Todaro's Remaining Arguments

Because the Court found that coverage does not exist according to the general terms of the insurance agreement at step one, no analysis of step two—whether an exclusion applies to negate coverage—is necessary. *See Harrington*, 455 Mich. at 382. In fact, no further analysis of any kind is necessary to resolve the case. Nevertheless, the Court briefly addresses Defendant Todaro's two remaining arguments. She argues that the intentional or criminal act exclusions, as worded, are against public policy because they defeat the policy's purpose. (ECF No. 23,

Response, PgID 400–02.) She also argues that Allstate has a separate duty to defend and indemnify Michael and Michelle Montoya because they accidentally caused Todaro's injuries through negligent parenting. (ECF No. 23, Response, PgID 402–07.) Neither argument is persuasive.

### 1. Intentional Acts Exclusions

Todaro's first argument is directed at the intentional or criminal acts exclusions from the family liability coverage and the guest medical expenses coverage. The language of both exclusions is identical:

> **We** do not cover any **bodily injury** or **property damage** intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any **insured person**. . . .

(ECF No. 21-3, Policy, PgID 325.) Todaro argues that these exclusions violate public policy because the word "intentional" could be interpreted so expansively that "reasonably expected" bodily injuries from innocent intentional acts, such as placing a folded shirt on a staircase, would not be covered under the policy. (ECF No. 23, Response, PgID 400–02.) These exclusions would then negate coverage for the significant majority of bodily injuries that would otherwise be covered under the policy, making the exclusions void as against public policy. (*Id.*)

There are two reasons this argument is unpersuasive. First, as explained above, Todaro's injuries are not covered by the Montoyas' House & Home Policy because they did not arise from an occurrence so the intentional act exclusions are

irrelevant. Second, Michigan courts have regularly found nearly identical intentional acts exclusions to be unambiguous and not against public policy. *See id.* at 383 ("[T]his Court has repeatedly held that the 'intended or expected' language that is used in the policy exclusion is 'clear and unambiguous.'"). In *Freeman*, the Michigan Supreme Court relied on "several recent decisions interpreting the identical exclusionary clause," which was "we do not cover any bodily injury or property damage which *may reasonably be expected* to result from the intentional or criminal acts of an insured person," to hold that the clause was not ambiguous. 432 Mich. at 685–86. The *Freeman* court enforced the clause, implicitly holding that it was not against public policy. *Id.*

That implicit holding makes sense considering the narrow definition that courts have given the word "expected" in the context of these exclusionary clauses. An "expected" injury is the most likely outcome of the intentional acts, not just a reasonably possible outcome. *See Harrington*, 455 Mich. at 384 ("[C]overage is precluded if the insured's claim that he did not intend or expect injury flies in the face of all reason, common sense, and experience.") (internal quotations and citations omitted). The *Freeman* court explained that proving that an injury was "expected" requires "a lesser degree of proof than intended," but it still requires a showing that the injury was the "natural, foreseeable, expected, and anticipated result of [the insured's] intentional act[s]." *Id.* This narrow definition ensures that

the intentional acts exclusion does not swallow up the general provision of coverage and ensures that the exclusion comports with public policy. *Contra Kurzmann*, 257 Mich. App. at 418–19 (noting that exclusion at issue had been against Michigan public policy for "more that twenty years" because it negates coverage that is otherwise required by law).

### 2. Coverage of Claims Against Michael and Michelle Montoya

Todaro also argues that Allstate has a separate duty to defend and indemnify Michael and Michelle Montoya against Todaro's claim under Michigan's parental liability statute. The statute allows an injured person to recover up to $2,500.00 in damages from the parents of "an unemancipated minor, living with his or her parents or parent, who has . . . maliciously or wilfully [sic] caused bodily harm or injury to a person." Mich. Comp. L. 600.2913. According to Todaro, Michael and Michelle Montoya are liable under this statute because their "negligent parenting" contributed to her injuries, which means that their liability arises from accidental conduct. (ECF No. 23, Response, PgID 402–07.) Because the Montoya parents' conduct was accidental, it constitutes an occurrence, which means that it is covered under the House & Home Policy. (*Id.*) This creative argument is fatally flawed.

At the outset, Todaro's claim against the Montoyas under Mich. Comp. L. 600.2913 is not a claim sounding in negligence. It is a derivative claim under a statute that "provides a method for collecting damages for the tortious conduct of

an unemancipated minor child," *Citizen Ins. Co. of Am. v. Lowery*, 159 Mich. App. 611, 618 (1987). A plaintiff need not allege that the parents acted intentionally, negligently, or accidentally in order to state a claim under this statute. In fact, a plaintiff does not need to allege any conduct at all by the parents because the statute holds parents "vicariously and strictly liable for bodily harm maliciously caused by their children." *Zapalski v. Benton*, 178 Mich. App. 398, 402 (1989). A claim under Mich. Comp. L. 600.2913 is distinct from a claim of negligent parental supervision—in *Zapalski* the court emphasized that plaintiff's decision to proceed with a negligent parental supervision claim rather than a claim under Mich. Comp. L. 600.2913 meant that the plaintiff had to allege actual negligent parental conduct. *See id.* at 402–03.

Here, Todaro, in her underlying Complaint, failed to allege that Michael and Michelle Montoya engaged in any negligent parental conduct. (*See* ECF No. 21-2, Underlying Complaint, PgID 307.) Instead, she alleged only vicarious liability for Amber Montoya's conduct under Mich. Comp. L. 600.2913. (*Id.*) As such, there is no basis for her argument that her claim against Michael and Michelle Montoya arose from accidental conduct.

Further, Michigan courts have already rejected similar arguments. In *Freeman*, the Michigan Supreme Court faced a coverage dispute over the duty to defend an insured whose wife used his firearm to shoot their neighbor when he was

not home. 432 Mich. at 682–84. Construing the claim against the husband as a negligent entrustment claim, the court found that "the duty to defend [the husband] is solely derivative of the duty to defend [the wife] under the policy," so because there was no duty to defend the wife under the intentional acts exclusion of the policy there was no derivative duty to defend the husband. *Id.* at 690. The court explained this decision by stating, "we look to the underlying cause of the injury to determine coverage and not to the specific theory of liability." *Id.* (internal quotations and citations omitted).

In this case, the underlying cause of Todaro's injuries was Amber Montoya's alleged intentional conduct, which means that Todaro's injuries did not arise from an occurrence and are not covered by the policy. Todaro's claims against Michael and Michelle Montoya are wholly derivative of her assault and battery claims against Amber and are not entitled to coverage. *Cf. Gorzen v. Westfield*, 207 Mich. App. 575, 578 (1994) ("Because the [parents'] claim for coverage is wholly derivative of [the son's] claim, which is excluded under the policy, the [parents] are not entitled to coverage.") Allstate therefore does not owe Michael and Michelle Montoya a distinct duty to defend and indemnify.

## V.    CONCLUSION

For the reasons outlined above, the Court GRANTS Plaintiff Allstate's Motion for Summary Judgment. (ECF No. 21.) Accordingly, the Court DECLARES that,

under the House & Home Policy numbered 960460096, Allstate Vehicle and Property Insurance Company does not have a continuing duty to defend or indemnify Amber, Michael, or Michelle Montoya against the allegations brought against them by Valentina Todaro in the Lapeer County Circuit Court, under Case No. 19-052796-CZ.

IT IS SO ORDERED.

Dated: March 5, 2020

s/Paul D. Borman
Paul D. Borman
United States District Judge